**Pages 1 - 29**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

CCSAC, INC., a California )
corporation, and CANN DISTRIBUTORS, )
INC., a California corporation, )
  )
     Plaintiffs, )
  )
  VS. )  **NO. C 20-02102 JD**
  )
PACIFIC BANKING CORP., a Washington )
corporation, JUSTIN COSTELLO, an )
individual, and GRN FUNDS, LLC, a )
Washington limited liability company, )
  )
     Defendants. )
_____)

San Francisco, California
Tuesday, November 15, 2022

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:
        SELNA PARTNERS LLP
        70 Washington Street, Suite 303
        Oakland, California 94607-3709
    BY:  **STEVEN M. SELNA, ATTORNEY AT LAW**
        **ROBERT W. SELNA, ATTORNEY AT LAW**

For Defendants:
        SML AVVOCATI P.C.
        888 Prospect Street, Suite 200
        San Diego, California 92037
    BY:  **STEPHEN M. LOBBIN, ATTORNEY AT LAW**

REPORTED BY:  Ana Dub, RMR, RDR, CRR, CCRR, CRG, CCG
        CSR No. 7445, Official U.S. Reporter

**Tuesday - November 15, 2022**                              **11:09 a.m.**

P R O C E E D I N G S

---o0o---

THE CLERK:  Calling Civil 20-2102, CCSAC, Inc. vs. Pacific Banking Corp.

Counsel, please state your appearances for the record.

MR. LOBBIN:  Good morning, Your Honor.  Stephen Lobbin here, SML Avvocati P.C., on behalf of defendants.

MR. SELNA:  Good morning, Your Honor.  Steven Selna for the plaintiffs, and with me is my partner Robert Selna.

THE COURT:  Okay.  Well, this is such a colossal waste of federal judicial resources.  We're here on motions for sanctions against the defendant, and there was an order to show cause and some other things, all arising out of what appears to have been multiple repeated and willful violations of my orders on discovery to the defendants and the defendants' obligations under the Federal Rules of Civil Procedure and ethical standards and obligations required of counsel.

So Defendant Costello is in custody, as I understand it, on criminal charges relating to charges of stealing CCSAC's money, among other counts, I guess.  So we're not going to do anything with respect to him and his culpability.  I'm going to defer that until the day comes when we might do it.

Now, it doesn't seem likely that's going to be any time soon, given the criminal prosecution; but I am going to take up

at the appropriate time, which will probably be after his guilt or innocence is determined, take up the question of whether he perjured himself in his responses to my orders to show cause with respect to the preliminary injunction and other defaults that he may have engaged in.

The record indicates that there is, at a minimum, very serious questions that he has, in fact, lied to the Court intentionally and willfully; but I'm not going to make a final decision on that until I have a chance to hear from him directly.  And because that is implicated in his criminal indictment, that won't be for some time.

I'm going to focus today on Mr. Lobbin and his law firm and what they did in connection with the discovery, as I think counsel bears a significant share of responsibility for why we're here today.

Let me start with the question of the declaration I received from Defendant Costello in response to my order to show cause with respect to whether defendants were honoring the injunction that I entered.  That's Docket Number 151.

Here's my first question, Mr. Lobbin.  I don't understand -- so in this declaration, Docket Number 151 -- this is dated November -- sorry -- September 15th, 2022 -- Costello, your client, says he knows exactly where the money is that CCSAC deposited.  It's in an account, something called GRN Funds.  It has an address in Tacoma, Washington.  And he

gives an account number and also says that the balance as of the date of the declaration, more or less, is $2.9 million and change.

Now, in his deposition, which was taken, I think, in May of 2022 --

Is that right, Mr. Selna?

**MR. SELNA:**  Correct, Your Honor.

**THE COURT:**  -- your client, Mr. Costello, said that he had no knowledge of the location of CCSAC's money and didn't have any understanding of how the funds had been handled, meaning he didn't know what the balance was, whether it was zero or 2.9 million or anything else.

So how did this 180 change happen between May of 2022 and the declaration in September of 2022?

**MR. LOBBIN:**  I impressed upon him that he better find out. And I, you know, helped him prepare that declaration in September with documentation to show.

He claimed all along that he wasn't involved in this company anymore.  He wasn't involved in where the money was.

**THE COURT:**  All right.  Let me just step in.

I am not asking you for your attorney-client communications, and you're not able to give that.

**MR. LOBBIN:**  Well --

**THE COURT:**  So I want to know what you did -- let me ask the question differently.

You drafted the declaration at Docket Number 151; is that right?

**MR. LOBBIN:** I did with -- you know, with the information from him.

**THE COURT:** Well, what did you do to attempt to verify the statements that your client was making to me under penalty of perjury?

**MR. LOBBIN:** I included the documents that were attached to the declaration, which are statements of account from the -- the GRN accounts.

**THE COURT:** That's all you did?

**MR. LOBBIN:** And I talked to his chief operating officer at the time, who told me that's what the company has. That's where they show their clients what's on deposit, what the balance is.

So I had not only Mr. Costello, but Mr. Hawkins confirm to me that what we were saying in that declaration was accurate with the accompanying documentation.

**THE COURT:** Well, I'm looking at the exhibits -- is that what you're talking to? -- to the declaration.

**MR. LOBBIN:** Yes.

**THE COURT:** I don't see how any of the statements about the location of the money at the GRN account or the balance of 2.9 million are in any way documented by these exhibits. Where is any of that information given?

This says a closing balance of 1.8 million.  That's 1.1 million less than your client's sworn statement.  So where is the missing 1.1 million in these exhibits?

**MR. LOBBIN:**  I don't have the declaration in front of me, and -- but I believe the declaration explains that the difference is from the -- on -- balanced from the payment that was -- I forget the language that they use, but it was from the -- unreconciled balance from the payment that had not yet shown up as returned from the -- the payment that was made to the State of California that was -- that was returned.

**THE COURT:**  That's nonsensical to me.  I mean, the statement that your client made in the declaration that you drafted, Mr. Lobbin, paragraph 7, says, quote (as read):

"The 'balance of funds as of September 9, 2022' is at least $2,923,858.13 . . . ."

And then it says, attached as Exhibit 1 is a true and correct copy of the deposits.  Nothing in these exhibits say anything about a $2.9 million deposit.  So at a minimum, saying there's $2.9 million in the account is just wrong.

Now, I understand there's a little song and dance about adjustments, but there's nothing here that indicates even close to being 2.9 million in the account, which, of course, would be a violation of my preliminary injunction order.

But more importantly, how is it he suddenly remembered all this after the deposition?

**MR. LOBBIN:**  Well, I can't -- without -- you know, without going into privileged conversations --

**THE COURT:**  I don't want privileged conversations.

How did it happen?  Did he have a flash of insight?  What happened?  How did he go from "I don't know a thing about this" in May of 2022 to giving me all this alleged detail in September of 2022?

**MR. LOBBIN:**  Well, I -- so what happened, according to my participation, is we prepared the written discovery responses starting in April, saying that the money is in a consolidated account with the company.

Obviously, plaintiff's counsel wants to know what's the account number, what's the balance; right?  And so in preparing for the deposition, those questions are going to come up. We've got to be prepared to answer those questions.

That's my participation in the proceedings.

So April, written discovery responses.  Here's where the money is.  Understandably, counsel is saying:  Not specific enough.  Need that information at the deposition.

Preparing my client for the deposition, he's obviously got whatever reasons he's got for -- you know, as we've seen transpire.  And, obviously, in response to this Court's OSC, you know, the specifics are necessary.

**THE COURT:**  The specifics were necessary a long time before my OSC.  My OSC is the end product of consistent

stonewalling and abusive discovery responses by you and your client.

So how is it that the light finally got shone on these documents only in September of 2022?  Why wasn't this done before his deposition?  Why wasn't it done in the written discovery responses?  What changed?  I'm asking you what changed.

**MR. LOBBIN:**  His counsel telling him to do something versus the Court telling him to do something is what changed. I --

**THE COURT:**  You hadn't been telling him anything about his obligations?

**MR. LOBBIN:**  Oh, my God.  Your Honor, with all due respect, I have been hammering my client since Day One getting involved in this case:  We have claims against us.  We have discovery.  We have a preliminary injunction.  We have to do this.

And my client -- you know, without going into what my client's telling me, you know --

**THE COURT:**  I don't know, but you can stop there.

Let me ask you this.  Let's move on now to the responses to the plaintiff's request for admissions and the accompanying interrogatory.

So in April of 2022, you filed -- we talked about this, I think, last time -- filed answers that I found both

completely superficial and contradictory and provided no meaningful information to the defendants.  I guess you supplemented those after it was clear to you which way the wind was blowing, in my mind.  You supplemented those in July of 2022 and suddenly came out, yet again -- just like with the declaration, the deposition, suddenly you had information in hand.

I don't understand why this wasn't done in the first case in April.  I mean, it cost your colleague here, Mr. Selna, a lot of time, money, and aggravation.  A good argument can be made -- I'm not making any conclusions about this, but a good argument can be made that this discovery stonewalling and gamesmanship cost them any realistic possibility of getting their $2.9 million back because the ball was being hidden.  And I have grave concerns, Mr. Lobbin, that you were a facilitator of that.  And I am going to get to the truth, and there are going to be consequences if that is true.

Now, what, again, changed?  How is it that all of a sudden in July of 2022 you had information to share and in April 2022 the door was closed?

**MR. LOBBIN:**  Your Honor, all I can say is I've -- I've been trying to do my best to -- I'm not part of the stonewalling.  This is not even a case that's part of my normal practice.  I'm helping --

**THE COURT:**  You need to stop.  You're counsel of record

for Mr. Costello.  You and you alone are his attorney.

**MR. LOBBIN:**  I understand, Your Honor.

**THE COURT:**  You and you alone are responsible for the communications to me and to opposing counsel and everything else that happens on behalf of Mr. Costello as his lawyer. Now, don't tell me -- because it's way too late in the game for you to say this and it's also a little bit questionable for you to hang your client out to dry like this -- that you're just an innocent victim.  I don't buy that for a second.  You're the lawyer.  You have duties as an officer of this Court.  You have duties under the rules.  You have obligations under the canons of professional ethics.  Right now, you're looking like you're O and 3 on all of those.

Don't come in here and tell me that it's not your fault. If you had a problem with him, you should have withdrawn.  You didn't.  You kept filing this stuff.  You kept signing this stuff.  You kept putting things on the docket with your name on it.

So how is it that all of a sudden, facts emerged between April and July of 2022?

**MR. LOBBIN:**  Your Honor, in July we had to respond to a summary judgment motion.

**THE COURT:**  In April you had to respond to written discovery.  So what?  You were called in April to answer the questions.  You didn't.  You gave nonsensical responses.

What happened between April and July that suddenly flipped the switch and gave you data to work with?  I'm asking you --

**MR. LOBBIN:**  My client --

**THE COURT:**  -- to explain it to me.

This is your last chance to tell me there's some rational reason here.

**MR. LOBBIN:**  I finally had access to the information.

**THE COURT:**  How does that happen?  How did you not have it in April?

**MR. LOBBIN:**  My client finally gave it to me.

**THE COURT:**  You answered discovery.  You flat-out -- this is you, the lawyer, Mr. Lobbin, did this.  You signed discovery saying that the request for admissions were, quote, denied, closed quote.  You didn't say:  I need more time to answer.  I don't have enough information.  You didn't ask, as far as I'm aware, for me to extend any deadlines because you were still working on the facts.  You didn't do anything.  You affirmatively represented "Denied," and then you gave a completely bogus and glib answer to the interrogatory that said, "State all facts for any unqualified denial."

Okay.  So that's not -- your ship has sailed on, oh, you were trying to gather more stuff.  You represented to me and to your colleagues across the aisle here that you had the answer and the answer was "no"; i.e., denied.  That's not "I'm waiting to get the record because my client's uncooperative."  That's a

completely different game.

**MR. LOBBIN:**  We supplemented to explain that denial, which hasn't changed; just the explanation for it.

I take your point, Your Honor, that there was an interrogatory response that gave, you know, an incomplete explanation, which we supplemented in the interrogatory responses, in the response to the summary judgment motion, and in further supplementation more recently.

So, you know, the denial was the result of the fact that the payment was made; it was returned.  That was -- that was the facts that defendants, you know, attested to.  And the admission -- request for admission was "Admit that the payment wasn't ever made."  And so that was denied.

**THE COURT:**  Anything you want to add, Mr. Selna?

**MR. SELNA:**  Yes.  Thank you, Your Honor.

The Court may recall that on September 8th, you posed these very questions to counsel; and counsel's response on September 8th was that it must have been a collating error that explained the response to Interrogatory Number 13.  It was: Perhaps that was a collating error, Your Honor.

**THE COURT:**  Collating?

**MR. SELNA:**  Collating.

**THE COURT:**  As in stapling papers together?

**MR. SELNA:**  Presumably the answer was offset from the proper interrogatory.

**THE COURT:**  Oh, I see.

**MR. SELNA:**  That's how I was processing it at the time.

Since then, counsel, in the most recent declaration, claimed that the reason that they were only able to provide substantive responses now was because it was a delay in developing all the facts in November of 2022 about the very transactions that are the basis for the lawsuit that was filed in March of 2020 and was the subject of written discovery from our office in June of 2021.

So --

**THE COURT:**  Let me ask you this.  Let's just talk here.

**MR. SELNA:**  Sure.

**THE COURT:**  I'm not binding your hands in any way.  But Costello, as far as I can tell from the detention order from the Southern District of California, was found trying to flee to Mexico with a backpack full of gold bars, Mexican pesos, and U.S. dollars.  There's some indication that he was fairly forthright in telling the FBI, when they arrested him, that he was on his way to try to leave the country.

The evidence I've seen in this case -- and you know better than I do, but what I've seen on my end, as the presiding judge, indicates to me that there's probably not a penny of your client's money left.  Maybe you know better than I do.  But given the fact that his guilt or innocence is so up in the air, I'm certainly not making any decisions, but the record so

far has a pretty strong flavor to it that that $2.9 million is long gone.

So what is it you'd like to do?  And there is, of course -- let's just be candid about this.  I need not advocacy, but some good legal thinking.  He is going to go through two years of prosecution -- what is it? -- in the Western District of Washington, and you know that's going to have an impact on this case because at least one of the allegations against him is having perjured himself in the declaration that he filed at Docket Number 151 in this case.

So what do you want to do?

**MR. SELNA:**  Your Honor, you know, let's focus for just a moment on the motion to stay, if I may, because from our perspective and as we've alleged or articulated in our briefing, there really should be nothing here for the Court to stay at this point because we believe we have made a strong case for terminating sanctions against Mr. Costello.  We believe that a default judgment is in order here, both under the Court's inherent authority and also Rule 37 and also other provisions that we could have asserted but --

**THE COURT:**  Let me just jump in.  I'm not necessarily saying it's a bad argument, but it's just incomplete.  That's why I set the OSC.  I wanted to examine and hear you examine Mr. Costello because that was going to be the datapoint that would let me decide whether, as the record indicates, he is a

perjurer and game player or whether there was some explanation for it that I just was not seeing.

And in the absence of that, I'm just going to be candid with you, I cannot issue terminating sanctions. I just can't.

So short of that -- we'll get to the issue of sanctions here and Mr. Lobbin in a minute; but just looking at your case as a whole, I mean, I don't see any alternative but to put it on ice. And the reason I mentioned the fact that in all likelihood there's no money left, I'm not sure it's going to hurt you anyway. I mean, you know what I mean?

**MR. SELNA:** Yeah. No, I understand the Court's point.

Just one quick observation, Your Honor. And I understand the Court has already made a decision about this.

Mr. Costello sat here on September 8th and represented to this Court that the funds were located at a specific bank.

**THE COURT:** Oh, I remember that. Now, he wasn't under oath, but that was certainly consistent with his declaration which was under oath. I remember that.

**MR. SELNA:** And then --

**THE COURT:** He clearly lied.

**MR. SELNA:** -- you gave him a week --

**THE COURT:** Yeah.

**MR. SELNA:** -- to provide the information that the Court was requesting.

And he submitted, by all accounts, a perjurous

declaration, suggesting that there was money there that wasn't there.  We know that from the motion to detain.  We know that from the indictment, that the federal investigation revealed $15, not 2.9 million.

In addition, Your Honor, he testified at least two or three times in deposition that he didn't know where the monies were.  And then when I asked him as an individual "Where are the monies?" he invoked the Fifth.

Now, there is a negative inference that may be taken from that invocation of the Fifth Amendment, and you combine that with direct lies to this Court on September 8th and September 15th, we believe that there shouldn't be anything to stay at that point in this case.  Multiple violations of this Court's orders, lying directly to this Court, filing two perjurious declarations with the assistance of counsel, there's just too much there, Your Honor.  I've never seen a case like this in my entire --

**THE COURT:**  Well, I understand what you're saying.  I just -- I'm not -- from a due process perspective, I'm just not comfortable going quite that far in the absence of hearing from the man himself, Mr. Costello.

I'm not saying that -- I mean, the momentum is definitely trending in your favor.  I'm with you on that.  But just let me ask you this.

**MR. SELNA:**  Yes.

**THE COURT:**  I mean, let's say you got a default judgment tomorrow.  I mean, there's nothing to get.  What would you do with it?  I mean, the guy's probably judgment-proof; right?

**MR. SELNA:**  We don't -- we don't know that at this stage, Your Honor.  We know that we are pursuing our own investigation.  We know the Government is pursuing their investigation.  The fact that the monies didn't appear in the Sound Credit Union account does not tell me, and I would submit does not tell anybody else, that there is no money to be had.  This gentleman was apprehended with a load of cash that was bound in a particular manner suggesting that it had been in some financial institution at some point.  We've heard suggestions that perhaps the monies are offshore.  So the leads are being pursued, but the trail is growing colder all the time.

**THE COURT:**  Well, but is it, though?  I mean, with the criminal case, you certainly will have a claim for restitution in all likelihood.  I can't guarantee it, but I would assume you would -- there's a pretty good reason to assume you would have a claim for restitution in the criminal context.

**MR. SELNA:**  Yes.

**THE COURT:**  And you say the FBI or somebody's looking into the offshore assets and assets generally.  I mean, can't get anything better than having the U.S. government collect that information for you because they can do it in ways that you

can't.

So I'm just -- we typically do, in parallel criminal and civil cases, stay in favor of the criminal case to go forward. I'm sure you know that.

Let's switch gears for a moment.  You have been put out in time and expense something in the amount of 61,000 for all of these discovery issues?

MR. SELNA:  That was as of the time of briefing, Your Honor.  Obviously, we've had to do quite a bit more in the interim.  We've had to deal with the oppositions to the -- opposition to the motion to stay.  We filed reply briefs in support of our motions.  We've had to --

THE COURT:  All right.  So there's yet another 20 or 30,000, maybe, on top of that?

MR. SELNA:  Yeah.

THE COURT:  All right.  So, I mean, what do you want to do with that?  Now, I'm not making any decisions about this yet, but I'm certainly considering whether and to what extent Mr. Lobbin should pay a share of that or all of it.  I don't know.  Either zero to 100 percent.  I don't know.

What's your view on that percentage?

MR. SELNA:  Well, Your Honor, you know, from our perspective -- and I kind of have been biting my tongue for a long time in this case about --

THE COURT:  You can speak freely now.

**MR. SELNA:**  -- about the conduct of counsel.

Mr. Lobbin prepared that response to Number 13.  His client didn't.  His client verified it, but he prepared it.

We took that issue up with him March of 2022, and we got an answer -- something bearing the resemblance of an answer this month to those -- to those requests for admissions and the response to the interrogatory.  As you said in September, that's on him.

He has ignored meet-and-confer letters in this case, which has caused greater expense to our client because we were forced to write more discovery deficiency letters.

We've had four court orders here, Your Honor, four court discovery orders; ten discovery deficiency letters.  Counsel knew what he was doing when he wrote that response and has ignored the meet-and-confer letters, forced us to come to you again.

You know, Your Honor, you wrote a -- you signed an order in April of this year in which you indicated that defendants could not withhold information or documents responsive to any discovery in this litigation, including plaintiffs' requests for admissions served on March 25, 2022, any of plaintiffs' interrogatories, or the request for production of documents.

And as you stated, as you signed this order, as to defendants (as read):

"Defendants understand that compliance with

these requirements is unconditional and not excused by any change in the circumstances of this case . . . ."

So Mr. Lobbin knew about that one.  He signed it on April 6th.  He misled the Court about claiming it was a collating error and then saying:  Oh, it took me this long to get the discovery or to get the facts.

He facilitated the preparation of two perjurous declarations.  And --

**THE COURT:**  What's the other one?

**MR. SELNA:**  It was a sham declaration.  You see, Your Honor, we would --

**THE COURT:**  I mean, I've mentioned Docket 151.  What's the other declaration?

**MR. SELNA:**  Well, there were two declarations:  the declaration in response to the OSC, but the declaration in opposing summary judgment.

**THE COURT:**  Oh, okay.  All right.

**MR. SELNA:**  Both of them were perjurious.

**THE COURT:**  I see.

**MR. SELNA:**  And he prepared them.

So, Your Honor, I mean, you know, when does one conclude that counsel has facilitated a fraud that's been perpetrated on the Court?

**THE COURT:**  Well, what are you suggesting?  50-50?  70-30?

I'm just trying to get your sense of how would you allocate -- if I awarded monetary sanctions for your fees and costs, how would you allocate that between attorney and client?

MR. SELNA:  If I was in the Court's position, I would be inclined to award at least half of it to counsel.

THE COURT:  All right.  Mr. Lobbin, any concluding remarks?

MR. LOBBIN:  Well, Your Honor, you know, we fully briefed this issue in Docket 168.  The -- to the extent in April there was a response -- unsatisfactory response to the interrogatory, and the interrogatory said, "If you deny any request for admissions, explain each denial."

In July -- and, again, the issue in the RFA was:  Admit that you didn't make this payment.  It's a very simple issue.  We denied it.  They weren't satisfied with the explanation, or maybe I messed up in the interrogatory response.  You know, that -- I -- maybe that happens.  It did happen.

In July, we opposed the summary judgment motion with a declaration explaining the basis for that denial.  So for counsel -- I take issue with counsel saying it's taken from April until now.  The summary judgment motion was presented to the Court.  The Court denied it.  And in the declaration, we explained the reason that the payment was made and returned and the documentation that defendants had to support that denial. So the targeted issue that we're talking about in terms of a

deficiency in a discovery response, the substance of it was fully addressed long ago.

And so, you know, I would just ask this Court for a little bit of temperance based on my 25-year history of being a lawyer in hundreds of cases.  I'm not a serial offender.  I'm not someone who perpetrates fraud.  That's not what I do.

I have a difficult client.  I'm not trying to say that, you know, I couldn't have done more.  But counsel and I had a meeting here in the court in April, I believe, or May where we stipulated to some agreements about discovery.  I'm not -- it's not a situation where I'm trying to, you know, divert and stall and obstruct.  I'm trying -- been trying to work with counsel all along to get an answer to this question.

**THE COURT:**  I don't see any basis in fact for that statement, Mr. Lobbin.  I mean, nothing happened in this case until I started to shake the tree with orders to show cause and direction to file a sanction motion.  At every turn, when it's just you and Mr. Selna alone, you slam the door in his face.  That's what the record says to me.  And miraculously, "noes" become "yeses" and "I don't know" becomes "Here are the facts" in periods of months with no explanation for why that, in any rational world, would suddenly change.

And the only obvious explanation for it that I can see is that it's because judgment day is here and you and your client are getting uncomfortable.

That's just not the way we litigate in this district and I'm sure not in any other district that you litigate in.

So what's your estimate of what the culpability should be? 50-50?  Something different?

**MR. LOBBIN:**  For me?

**THE COURT:**  I'm talking about allocating the costs that your client has -- you and your client have forced your colleagues to incur needlessly.  How would you, in your mind, allocate it between you and your client; you, personally, and your client?

**MR. LOBBIN:**  I'm not sure how to respond to that.  I -- my position is that I've been doing everything I can or doing my best.  But if that's not true --

**THE COURT:**  Well, I'm telling you, the record doesn't say that.  The record says exactly the opposite.

**MR. LOBBIN:**  Well --

**THE COURT:**  So assuming I order sanctions, do you have any -- if you don't want to say anything, that's fine.  It doesn't matter to me.  It's up to you.  I'm going to give you a chance if you want to.

Do you have anything you want to say about that?  If you don't, you don't.  That's fine.

**MR. LOBBIN:**  Well, first, with all due respect, there are no "noes" that became "yeses."  I just want to state that on the record.

But addressing your --

**THE COURT:**  That's not true.  It's simply not true.  At his deposition he said, "I don't know"; and then suddenly he said, "Here are the facts."  That's the equivalent of a "no" becoming a "yes."  It's as plain as day to me that's a "no" becoming -- "No, I don't know."  "Oh, yes, I do know."  That's exactly what it is.

**MR. LOBBIN:**  Understood.  And my culpability for that, in particular, I believe is zero.  But --

**THE COURT:**  No, I'm not talking about that.  I'm talking about your culpability for the fact that your colleagues on the plaintiff side have incurred 60,000 to 80,000 dollars worth of fees because of improper discovery responses, negligent meet and confers, poor discharge of your responsibilities under the rules to be forthcoming and honor your discovery obligations, the fact that they've had to file motion after motion and letter after letter to getting anything out of you.  That's what I'm talking about.

I'm not talking about the answers.  We're past that.  Now we're just talking about all the money that Mr. Selna and his client had to pay to clean up this mess.

**MR. LOBBIN:**  Well, I suppose my estimate of culpability is my ability to pay something; and that's -- for me and my family, that's, you know, 10- or 15,000 dollars at most.

**THE COURT:**  I'll tell you what.  I'm going to have you --

I want you two to have a discussion about this.

All right, Mr. Selna?  See what you can work out with Mr. Lobbin in terms of this issue.

**MR. SELNA:**  A stipulation, Your Honor?

**THE COURT:**  Yeah.  And if you can't, you can't, and I'll just make a decision.  But --

**MR. SELNA:**  If I may, Your Honor, may I --

**THE COURT:**  Sure, yeah.

**MR. SELNA:**  -- address a couple of comments of counsel.

And I apologize if --

**THE COURT:**  Yes, that's fine.

**MR. SELNA:**  You know, it wasn't one RFA.  It was 22.  And there was --

**THE COURT:**  All denied; right?

**MR. SELNA:**  All denied, unequivocally denied, and then accompanied by this nonsensical response to 13.

After you signed an order saying, "You've got to put up. You've got to put up all of your facts, your people, your documents" -- that was in April -- and so what happens is we file a summary judgment motion.

Then he drafts the declaration for his client that creates the issue of fact in the case, a sham declaration based on no facts in the case.

We should have been done then.  We should have been done in August in this case.  The Court should have been done.  We

should have been done.  We should have -- we -- there -- it was a straightforward motion defeated by a perjurious declaration, a sham declaration which, in and of itself, is worthy of sanctions under 54(h).

Counsel facilitated that.  It went from "I don't know" to "Guess what?  This is the reason that there's no evidence of payment of the taxes.  It's because the plaintiffs breached the agreement."

Unfounded.  You can't find a shred of evidence to support that, but it was enough to defeat summary judgment.

And so I just have to say, just to make the -- just so the record is absolutely clear about not only the egregious behavior, but also the consequences of it to our client.  So we're talking about another six months, five months of significant motion practice and --

**THE COURT:**  Well, that's what we're -- 60 to 80, or whatever the upper boundary number is, 60 to 80,000 dollars, that's what we're trying to allocate.

**MR. SELNA:**  Okay.  Fair enough.

**THE COURT:**  So I'd like you to discuss it.  If you can't solve it, you know, I'll either do it, or I might send you to a magistrate judge.  I don't know.

I'm probably going to stay the case just because of the reasons I talked about earlier, but I want to emphasize it's a stay; it is a temporary suspension, because I am going to

revisit this after the criminal case is resolved, and there are going to be consequences once we have -- everybody has a full and fair opportunity to tell me their side of the story.

I am not going to let the OSC issue or the breach or non-breach of my preliminary injunction order just go by the wayside.  I don't care if it takes 18 months, 24 or 36.  There will be another day that we get together in this courtroom.  Mr. Selna might not even be here.  Who knows?  But I am going to pursue it, and I will reach a conclusion.

**MR. SELNA:**  I certainly hope to be here, Your Honor.

**THE COURT:**  But in the meantime -- well, the criminal case may resolve it.  I don't know.  A guilty verdict or a guilty plea would admit all material facts, and that may be all you need.  I just don't know.  But it may also go the other way.  It may end up getting a non-guilty determination.  But that's for somebody else to decide, not me.

In the meantime, here's what I want you to do.  You talk with Mr. Lobbin, Mr. Selna, about some way of resolving it.  I don't need to know the details.  You can just tell me you resolved it.  You don't even have to tell me the allocation.  If you reach that point, you can just file a joint notice saying the issues have been resolved.  If you cannot, you can just file something saying, "We met and conferred.  We could not resolve the issue."

If that's the case, I want you to send me a proposed order

that follows our discussion today and focuses on just the fees -- okay? -- the costs that your clients have incurred and a good explanation about the basis for those costs and a record in fact and some documentation of how much too.  You've got to send me some billing records and some other things, the usual things you would do for attorneys' fees, and then a brief, very, very brief discussion about why a fee shifting under Rule 37, or whatever other vehicle you want to cite, would be appropriate.  Okay?

You take your time on that.  You just do it whenever you want.

And then after that, Mr. Lobbin, you can file a response.  I'm going to get it as a proposed order.  And two weeks after that's filed, whenever that may be, Mr. Lobbin, you can file a response, and I'll take both those into account.

Right now, I am leaning heavily towards the imposition of fees on attorney and client, but I will wait until I get these further papers before I make a final decision.

Okay?

**MR. LOBBIN:**  Thank you, Your Honor.

**MR. SELNA:**  Yes, Your Honor.  Thank you.

**THE COURT:**  And make sure you talk.

**MR. SELNA:**  We will, Your Honor.

**THE COURT:**  Is that going to be okay?  Are you able to do it, or is that just impossible?

**MR. SELNA:**  I see no reason why we can't at least talk.

**THE COURT:**  Mr. Lobbin?

**MR. LOBBIN:**  I see no reason why -- we have in the past. I don't see any reason why we can't.

**THE COURT:**  Okay.  Thank you.

**MR. SELNA:**  Thank you for your time, Your Honor.

**MR. LOBBIN:**  Thank you, Your Honor.

**THE CLERK:**  All rise.  Court is in recess.

(Proceedings adjourned at 11:49 a.m.)

---oOo---


<u>**CERTIFICATE OF REPORTER**</u>

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:  Tuesday, December 13, 2022




*Ana Dub*

_____

Ana Dub, CSR No. 7445, RDR, RMR, CRR, CCRR, CRG, CCG
Official United States Reporter